UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| WILBURN AKRIDGE, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-244-SNLJ |
| | ) |
| ANDREW M. SAUL[1], | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

The Commissioner of the Social Security Administration denied plaintiff Wilburn Akridge, Jr.'s application for Disability Insurance Benefits under Titles II and XVI of the Social Security Act. Plaintiff now seeks judicial review (#11). The Commissioner opposes the motion (#16), and the issue is ripe. As discussed below, the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

## I.    Procedural History

Plaintiff Akridge was born in 1972 and attended school through ninth grade. Before his alleged disability arose, he worked on an assembly line as a detailer, as a laborer, as a painter, and as a transfer cart operator. He alleges he became disabled on June 1, 2015, later amending his onset date to October 30, 2015, due to the following impairments: debilitating migraines; double vision with headaches; loss of coordination

---

[1] After this case was filed, Saul was confirmed as the Commissioner of the Social Security Administration. Pursuant to Federal Rule of Civil Procedure 25(d), Saul is substituted for Deputy Commissioner Nancy A. Berryhill as the defendant in this suit.

with migraines; pain and muscle spasms in the back; mental problems, depression; and thoughts of suicide.

Plaintiff testified that he sustained a neck and head injury at his place of employment in 2013. After that injury, he began having headaches that gradually worsened until June 2015, when he stopped working full time. He testified that he has had migraine headaches "almost every day" since 2015 and every day during the year prior to the hearing and that, on 15-20 days of the month, he experienced a more serious migraine headache. Medical records reflect he first saw a nurse practitioner about his headaches in February 2015, and he was referred to a neurologist. The neurologist, Dr. Cooper, prescribed medication in March 2015. In July 2015, Dr. Cooper completed paperwork required by the Family and Medical Leave Act, that stating it was medically necessary for Akridge to be absent one to two times per week for one to two days per migraine episode.

Akridge saw several providers over the next year and presented to emergency rooms with severe migraines. Another neurologist, Dr. Kumar, prescribed new medications and advised plaintiff to stop taking ibuprofen and to avoid coffee, chocolate, and known triggers. Plaintiff continued to see Dr. Kumar, who adjusted his medications and in 2016 administered Botox injections. Plaintiff saw another neurologist, Dr. Applegate, on August 4, 2016. She administered a dihydroergotamine protocol and Botox, and she administered Botox again on November 10, 2016.

Plaintiff saw Dr. McGee on January 19, 2017 for venous insufficiency. An MRI of plaintiff's head showed stable right frontal subcortical white matter T2 hyperintensity,

possibly related to migraine headaches. On February 2, 2017, Akridge told Dr. Applegate he had no improvement with Botox treatments and had failed to obtain relief with a number of other medications. Dr. Applegate advised him to stop smoking and to continue with the Botox treatments for a year. On February 18, Dr. Applegate stated that Akridge had experienced migraines on 24 days out of 30 and that 17 of those were severe. She added that with treatment Akridge had had approximately a 20% improvement in total headache days and a 37% improvement of his severe headaches.

On June 15, 2017, Akridge saw Dr. Applegate again. She noted that plaintiff reported symptoms of headaches, photophobia, phonophobia, and nausea that occurred for times per week and lasted for 12 hours. Dr. Applegate saw no reason to continue the Botox treatments because Akridge had experienced no improvement of his headaches over the year of Botox treatments. She referred him to a pain clinic. Plaintiff also went to the ER three times in June and July for his migraine symptoms. On July 18, 2017, an MRI of the thoracic and cervical spine revealed mild to moderate abnormalities.[2]

Akridge testified on September 15, 2017 that he had not seen much improvement with treatments and that his doctor at the time, Dr. Applegate, had advised him that there was nothing else she could do to help him. He described numerous triggers for migraines and the ways he helped manage them. Akridge also testified he could perform activities

---

[2] Plaintiff submitted to the Appeals Council additional treatment notes from various providers dated August 16, 2017 through February 2018. The Appeals Council explained that the medical evidence either does not show a reasonable probability that it would change the outcome of the decision, or it relates to a different time period not covered by plaintiff's claim. Plaintiff does not appear to challenge this finding.

with "a lot of breaks." He acknowledged that he had not always been consistent in taking medication at the beginning of a headache, but that at the time of the hearing he did take medication as a headache was starting. There was also testimony that plaintiff could feed and water his father's animals daily, and that he did some mowing, repairs, carpentry, and other chores around the property on which his lived.

A vocational expert also testified at the hearing.

The Administrative Law Judge concluded on December 20, 2017 that plaintiff was not under a disability as defined in the Social Security Act. On August 10, 2018, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II.  Disability Determination—Five Steps

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in

4

substantial gainful activity, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(c), 404.1520a(d), 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d); 416.920(a)(3)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(5)(i), 416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003)

(internal quotations omitted); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work that exists in significant numbers in the national economy shifts to the Commissioner. *See Bladow v. Apfel*, 205 F.3d 356, 358–59 n.5 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)( v). If the

claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## III. The ALJ's Decision

At Step One, the ALJ found Akridge met the insured status requirements through the relevant period, and he had not engaged in substantial gainful activity since October 30, 2015. At Step Two, the ALJ found Smith suffers from "chronic migraine headaches, status-post blunt trauma to the head," a severe impairment.

At Step Three, the ALJ concluded Akridge does not have an impairment or combination of impairments that meets or equals one of the presumptively disabling impairments listed in the regulations.

Next, in Step Four, the ALJ determined Akridge's RFC.[3] As noted, the ALJ found that Akridge

> has the residual functional capacity to perform a full range of work at all exertional levels; however, he has non-exertional limitations. He can occasionally climb, balance, stoop, kneel, crouch, and crawl. He should have no more than occasional exposure to extreme heat, cold, wetness, and vibrations. He should have no exposure to noise levels above level 3, as defined by the Dictionary of Occupational Titles (DOT), and no more than occasional exposure to pulmonary irritants such as dust, fumes, odors, and

---

[3] In the past, there has been some confusion as to when the RFC is determined, which affects who holds the burden of proof in establishing an appropriate RFC. In this Circuit, it has been held that "the RFC is used at both step four and five of the evaluation process, but it is determined at step four, where the burden of proof rests with the claimant." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (quoting *Young v. Apfel*, 221 F.3d 1065, 1069 n. 5 (8th Cir. 2000)); *see also Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014) ("Steps 4 and 5 require the ALJ to determine a claimant's RFC[.]").

7

> gases. He should have no exposure to hazardous conditions such as working around heights or moving machinery. Further, he can never climb ropes, ladders, or scaffolds.

(Tr. 96). As part of this determination, the ALJ found plaintiff's medically determinable impairments could reasonably be expected to cause symptoms. However, the ALJ also found that his statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.

The ALJ gave "moderate weight" to the opinion of Dr. Cooper, the neurologist who opined plaintiff would miss work for up to two days per week and approved the claimant to take family medical leave from his previous job in July 2015. However, the ALJ stated that, in light of later evidence, greater weight was given to the opinion of the state agency and Dr. Applegate who opined that with continued treatment the migraines should become manageable. The ALJ noted that Dr. Applegate documented a 37% improvement or reduction in occurrence of severe migraine episodes. The ALJ found that plaintiff's medical records corroborated the moderate success of Botox treatments and nortriptyline in reducing the frequency of migraines, despite the plaintiff's testimony that such treatments were ineffective. Similarly, medical records show that the claimant had relative success with acute treatment from dihydroergotamine mesylate ("DHE") in alleviating migraine headaches once they had begun. Overall, the ALJ determined, the management of the plaintiff's "migraine headaches appear to be appropriate, responsive, and at least modestly effective to allow the claimant to remain active, independent, and functional such that he can perform work tasks on a consistent basis, taking precaution to

avoid known and likely irritants or migraine instigators." The ALJ also noted that plaintiff continues to smoke cigarettes—up to half a pack per day—despite pleas from his healthcare providers to stop smoking.

Based on this RFC determination, however, the ALJ determined Akridge cannot perform any past relevant work.

At Step Five, the ALJ analyzed whether Akridge can successfully adjust to other work. For that reason, the ALJ relied on vocational expert ("VE") testimony to determine whether jobs exist in the national economy for an individual with the claimant-s age, education, work experience, and RFC. The VE testified that Akridge would be able to perform the requirements of, for example, a retail marker and a garment sorter. The ALJ then found these jobs exist in significant numbers in the national economy and concluded Akridge is not disabled.

## IV. Standard of Review

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is less than a preponderance of the evidence but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (alteration in original) (*quoting Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987)). The Court must also consider any evidence that fairly detracts from the Commissioner's decision. *Id.* "[I]f there is

substantial evidence on the record as a whole, [the Court] must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992). In reviewing whether the ALJ's decision was supported by substantial evidence, this Court does not substitute its own judgment for that of the ALJ—even if different conclusions could be drawn from the evidence, and even if this Court may have reached a different outcome. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).

## V. Discussion

Plaintiff's sole argument is that the ALJ did not properly assess plaintiff's limitation in absenteeism due to migraines after affording moderate weight to a treating neurologist's opinion.

In analyzing the medical opinion evidence, the ALJ discussed the opinion of one of plaintiff's treating neurologists, Dr. Cooper. On July 14, 2015, before the relevant period began, Dr. Cooper completed a form under the Family and Medical Leave Act ("FMLA"). The neurologist stated that plaintiff had intermittent migraines that could be severely disabling and that plaintiff would be incapacitated over the next six months for one to two times per week, up to two days per episode. The ALJ gave this opinion moderate weight. However, based on later evidence concerning the period at issue, the ALJ gave "greater" weight to the opinion of the state agency opinion of John Marshall Jung, M.D., and the opinion of plaintiff's subsequent treating doctor, Clara Applegate, M.D., who opined that, with continued treatment, plaintiff's migraines should become manageable.

Specifically, state agency consultant Dr. Jung reviewed plaintiff's file on March 9, 2016. State agency consultants are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. *See* 20 C.F.R. §§ 404.1527(e)(2)(I), 416.927(e)(2)(I). Thus, regardless of the consultant's individual specialty, a state agency consultant is an expert in social security disability evaluation. *See id.* Dr. Jung extensively discussed the medical records in the file. In evaluating plaintiff's treatment records in 2015, Dr. Jung noted he saw a nurse practitioner for his headaches and had taken some medication but had only short-term relief . As plaintiff continued treatment, Dr. Jung observed that in September 2015, plaintiff had never kept a headache diary, so triggers were unknown. Plaintiff attended his first and only visit at a treatment facility on October 7, 2015, the day before he applied for disability and reported he wanted to see about getting on disability. He described symptoms associated with blurred vison and confusion and ambulated with a cane in his right hand. Later during the visit, he placed an eye patch over his left eye, reporting double vision. Dr. Jung further noted that during his face-to-face interview for his disability application, plaintiff was not observed to have any difficulty with hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing, walking, seeing, using hands, or writing. Accordingly, Dr. Jung opined that plaintiff had no exertional limitations, but he had other non-exertional limitations: he could only occasionally climb ramps and stairs, and he could never balance or climb ladders, ropes, or scaffolds. He was unlimited in his ability to stoop, kneel, crouch, and crawl. However, he had to avoid concentrated exposure to extreme cold, heat, wetness, and humidity. He

had to avoid even moderate exposure to noise, vibration, fumes, odors, dusts, gasses, and poor ventilation. He had to avoid all exposure to hazards, such as machinery and heights. This Court concludes that the ALJ properly gave Dr. Jung's opinion more weight because it was consistent with the record as a whole.

But Dr. Jung's opinion was not the only opinion to which the ALJ ascribed more weight. Dr. Applegate was another of plaintiff's treating neurologists—she saw him for a longer period of time than Dr. Cooper, and her treatment was subsequent to Dr. Cooper's opinion. On February 18, 2017, Dr. Applegate explained that, since starting Botox treatment, plaintiff had a near 20% improvement in total headache days and a 37% improvement of severe headaches. She stated that with continued treatment, his migraine headaches should become manageable. The ALJ further explained that clinical treatment records appeared to corroborate the modest success of Botox treatments and nortriptyline in reducing the frequency of migraines, despite plaintiff's testimony that such treatments were ineffective. Although the Court notes that Dr. Applegate ultimately determined that the Botox treatments were unsuccessful, she referred plaintiff to other providers for further preventative treatment. Regardless, the ALJ noted that records showed plaintiff had relative success with acute treatment from dihydroergotamine mesylate in alleviating migraine headaches once they had begun.

Overall, the ALJ concluded that the management of plaintiff's migraine headaches appeared to be appropriate, responsive, and at least modestly effective to allow plaintiff to remain active, independent, and functional such that he could perform work tasks on a consistent basis, taking precaution to avoid known and likely irritants or migraine

instigators. Thus, the ALJ properly gave more weight to opinions of Drs. Jung and Applegate because they were consistent with the record.

Plaintiff primarily argues that it was error for the ALJ to give Dr. Cooper's opinion moderate weight while not explaining why she did not also use Dr. Cooper's opinion that plaintiff would be absent two days a week in the RFC finding. The ALJ explained that she gave greater weight to subsequent opinions. It is clear the ALJ rejected the opinion regarding plaintiff's alleged absenteeism and did not include it in the RFC finding. The opinion regarding plaintiffs' absenteeism was before plaintiff underwent additional treatment for his migraines. As the ALJ explained when he gave greater weight to the other opinions, any suggestion of extreme limitations ran contrary to the evidence as a whole, and an ALJ is required to evaluate medical opinions in the context of the entire record. *See, e.g.*, *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Because substantial evidence as a whole supports the ALJ's decision, this Court must affirm. *See Weikert*, 977 F.2d at 1252. As noted, this Court does not substitute its own judgment for that of the ALJ—even if different conclusions could be drawn from the evidence, and even if this Court may have reached a different outcome. *Id.*; *see also McNamara*, 590 F.3d at 610.

The Court also notes that evaluation of plaintiff's subjective claims and the consideration of medical opinions of record is interrelated; the ALJ's decision to discount plaintiff's statements influences the weighing of medical opinions that were based in part

13

on plaintiff's reports, and the ALJ's evaluation of the medical opinions in turn informs whether medical evidence supported the RFC determination. *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016). So long as an ALJ adequately explains the underlying evidentiary basis for her RFC determination, as she did in this case, she has satisfied the demands of SSR 96-8p. Fundamentally, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007). Accordingly, after thorough review, the ALJ reached a determination regarding plaintiff's RFC that did not precisely mirror any of the medical opinions in the record. This decision was entirely within her discretion, because "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)). Moreover, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013). The ALJ properly considered plaintiff's alleged migraines, gave good reasons to support her finding that plaintiff's subjective reports were less than fully consistent, and further explained the bases by which she assessed opinion evidence. The Court defers to the ALJ's determination, which is supported by substantial evidence.

## VI. Conclusion

This Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence. It does not

substitute its own judgment for that of the ALJ. *McNamara*, 590 F.3d at 610. Having found the ALJ's conclusions were supported by substantial evidence and that legal standards were correctly applied, this Court affirms the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint (#1) is **DISMISSED with prejudice**. A separate judgment will accompany this Order.

Dated this 23rd day of March, 2020.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE